NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2022 VT 12

No. 2021-177

| | |
|---|---|
| Sadie Boyd, Madeline Klein & Town of Whitingham | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windham Unit, |
| | Civil Division |
| | |
| State of Vermont | January Term, 2022 |

Katherine A. Hayes, J.

James A. Valente and Adam W. Waite of Costello, Valente & Gentry, P.C., Brattleboro, for
 Plaintiffs-Appellants.

Thomas J. Donovan, Jr., Attorney General, and David Boyd, Assistant Attorney General,
 Montpelier, for Defendant-Appellee.


PRESENT: Reiber, C.J., Eaton and Carroll, JJ., and Johnson, J. (Ret.), and Bent, Supr. J. (Ret.),
 Specially Assigned


¶ 1.   **CARROLL, J.**  Plaintiffs are Sadie Boyd, a student at Twin Valley Middle High School in Whitingham, Vermont; Madeleine Klein, a resident and property owner in Whitingham; and the Town of Whitingham. In October 2017, plaintiffs filed a complaint for declaratory and injunctive relief against defendant State of Vermont, arguing that the education funding and property taxation system set forth in 16 V.S.A. ch. 133 and 32 V.S.A. ch. 135 violated the Education Clause, the Proportional Contribution Clause, and the Common Benefits Clause of the Vermont Constitution. They claimed that the system was unconstitutional because it deprived plaintiff Boyd of an equal educational opportunity, required plaintiff Klein to contribute

disproportionately to education funding, and compelled the Town to collect an unconstitutional tax. The civil division granted the State's motion for summary judgment, concluding that plaintiffs had failed to demonstrate that the alleged inequities were caused by the statutes in question or that the education property taxation system lacked a rational basis. We affirm.

## I. Relevant Law

¶ 2.     Vermont's education funding and property taxation statutes are intended "to make educational opportunity available to each student in each town on substantially equal terms, in accordance with the Vermont Constitution and the Vermont Supreme Court decision of February 5, 1997, Brigham v. State of Vermont." 16 V.S.A. § 4000(a). Chapter II, § 68 of the Vermont Constitution, known as the Education Clause, makes education "a fundamental obligation of the state." Brigham v. State (Brigham I), 166 Vt. 246, 263, 692 A.2d 384, 394 (1997) (per curiam); see Vt. Const. ch. II, § 68 (providing that "a competent number of schools ought to be maintained in each town unless the general assembly permits other provisions for the convenient instruction of youth"). In the landmark Brigham I decision, we recognized that the Education Clause and the Common Benefits Clause together guarantee Vermont students a right to equal educational opportunities, and concluded that the then-existing statewide education funding scheme violated this right. 166 Vt. at 268, 692 A.2d at 397.

¶ 3.     At the time Brigham I was decided, Vermont public schools were financed by a combination of funds raised by towns and cities through local property taxes  funds distributed by the State under its so-called foundation plan. The foundation plan provided money to school districts to allow them to spend an amount per pupil that would provide a minimally adequate education. Despite this assistance, wide disparities in per-pupil spending existed between rich and poor school districts. Towns with greater property wealth spent more per pupil and had lower effective tax rates than poorer towns. The State conceded in Brigham I that as a result, children

2

living in property-poor school districts lacked the same educational opportunities as those living in wealthier districts.

¶ 4. We held that this system deprived Vermont students of their constitutional right to equal educational opportunities. Id. We noted that "[t]he Constitution does not, to be sure, require exact equality of funding among school districts or prohibit minor disparities attributable to unavoidable local differences." Id. at 267, 692 A.2d at 397. However, we rejected the State's argument that the foundation plan sufficiently ameliorated the funding disparities between rich and poor districts to eliminate a constitutional claim of discrimination, concluding that the system fell "well short of achieving reasonable educational equality of opportunity." Id. We went on to explain:

> In so holding we emphasize that <u>absolute</u> equality of funding is neither a necessary nor a practical requirement to satisfy the constitutional command of equal educational opportunity. As plaintiffs readily concede, differences among school districts in terms of size, special educational needs, transportation costs, and other factors will invariably create unavoidable differences in per-pupil expenditures. Equal opportunity does not necessarily require precisely equal per-capita expenditures, nor does it necessarily prohibit cities and towns from spending more on education if they choose, but it does not allow a system in which educational opportunity is necessarily a function of district wealth. Equal educational opportunity cannot be achieved when property-rich school districts may tax low and property-poor districts must tax high to achieve even minimum standards. Children who live in property-poor districts and children who live in property-rich districts should be afforded a substantially equal opportunity to have access to similar educational revenues. Thus, as other state courts have done, we hold only that to fulfill its constitutional obligation the state must ensure <u>substantial</u> equality of educational opportunity throughout Vermont.

Id. at 268, 692 A.2d at 397.

¶ 5. After <u>Brigham I</u> was decided, the Legislature made major changes to the education funding and property taxation scheme, and it has continued to make refinements in subsequent years. See, e.g., 1997, No. 60; 2003, No. 68. Under the current system, voters within each school

3

district decide the district's budget for each fiscal year. See 16 V.S.A. § 428(a) (governing town school districts); id. § 511(a) (governing incorporated school districts). The budgets are then funded by the State, which collects property taxes at rates it sets to cover a portion of the cost. See id. § 4025 (establishing Education Fund, which is funded by education property tax as well as revenues from state lotteries and other taxes, and is to be used to pay school districts and supervisory unions in accordance with 16 V.S.A. § 4028); id. § 4028(a) (providing for payment of "adjusted education payment" to school districts); id. § 4001(14) (defining "adjusted education payment" as "district's education spending per equalized pupil"); 32 V.S.A. § 5402(a) (setting uniform statewide education property tax rates). Property is divided into two categories for purposes of the education tax: homestead property, meaning the principal dwelling and surrounding land owned and occupied by a resident individual as the individual's domicile; and nonhomestead property, which includes most other types of property. 32 V.S.A. § 5401(7), (10) (defining homestead and nonhomestead property); id. § 5402(a) (setting different rates for homestead and nonhomestead property).

¶ 6. The State sets homestead property tax rates using universal statewide formulas to address differences in property wealth between districts, so that voters in districts with the same spending per equalized pupil pay approximately the same homestead property tax rate without regard to whether property values in each district are relatively high or low. See id. §§ 5402, 5404-5405; Brigham I, 166 Vt. at 255, 268, 692 A.2d at 389, 397 (invalidating previous funding scheme under which per-pupil spending was highest in wealthy districts, which benefited further from low school tax rates, while towns with limited resources spent less per student and paid more in taxes). The legislative body of each municipality is required to bill property taxpayers as directed by the Commissioner of Taxes in accordance with the education tax rates. 32 V.S.A. § 5402(b).

¶ 7. Under the current system, if a school district spends more than 121% of the statewide average district education spending per equalized pupil in fiscal year 2015, increased by

4

inflation through the fiscal year for which the amount is being determined, its homestead property tax rate increases twice as fast on spending above that threshold. Id. § 5401(12) (defining "excess spending"); id. § 5401(13) (explaining how education property and income tax spending adjustments are calculated). The Legislature has exempted certain items from the excess spending calculation, including approved capital construction spending and special education spending. 16 V.S.A. § 4001(6)(B).

## II. Facts

¶ 8.    The following facts were undisputed for purposes of summary judgment.[1]  At the time this case was filed, the Twin Valley Contract School District, a joint contract district created by the Whitingham and Wilmington School Districts, operated the schools within its borders. In 2019, Twin Valley became a unified union school district and the Whitingham and Wilmington school districts ceased to exist. At all relevant times, Twin Valley operated all schools within the district and its school board proposed its budgets, which were approved or rejected by district voters. The Town of Whitingham did not operate or fund any schools.

¶ 9.    In fiscal years 2016-2019, the Twin Valley district had between 400 and 500 equalized pupils. During that period, Twin Valley's education spending per equalized pupil exceeded the Vermont statewide average by nineteen to thirty percent. The district spent, on average, $3621 more per equalized pupil than the overall statewide average. During the same period, other districts similar to Twin Valley—meaning districts with 350 to 550 pupils that operated schools for all grades—spent less than the statewide average per pupil. Twin Valley spent an average of $4047 more per pupil than these similarly sized districts.

---

[1]  Defendant filed a statement of undisputed facts. Plaintiffs responded with their own statement of facts but did not directly respond to defendant's statement of facts. Accordingly, for purposes of summary judgment, defendant's facts are deemed undisputed. See V.R.C.P. 56(e) (stating that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion").

¶ 10.    While Twin Valley spends more per pupil than the average district in Vermont, its socioeconomic makeup puts it generally in the lower portion of districts in the state, except for its home values, which are near or slightly above average.  However, according to plaintiffs' expert, Twin Valley's spending is not driven by demographics; Twin Valley spends more per student than other districts with similar demographics.

¶ 11.    During the 2017-2018 school year, Twin Valley offered fewer than 100 high-school-level courses.[2]  The previous year, Champlain Valley Union High School, which is the largest high school in Vermont with a population of over 1200 students, offered more than 150 courses.  Students at Twin Valley have access to many other courses online and in person through dual enrollment and early college class options at participating colleges and the Windham Regional Career Center.

¶ 12.    Plaintiff Boyd was a student at Twin Valley Middle High School when this case was filed.  She testified that she would have preferred to have more options for courses while attending that school, such as business, child development, and science classes.  She preferred to take classes in person rather than online.  She also would have liked to play lacrosse and volleyball, but Twin Valley did not offer these extracurricular sports.

¶ 13.    Students at Twin Valley take college preparatory tests at lower rates than average for high schools in Vermont and receive lower-than-average scores on those tests.  The high-school dropout rate at Twin Valley is somewhat higher than the statewide average.

¶ 14.    As a whole, Vermont spends more of its total economic output, as measured by gross domestic product, on public education than any other state.  It has some of the highest overall levels of per-pupil spending in the country.  Education spending in Vermont is not highly

_____

    [2]  Plaintiffs' statement of facts states that Twin Valley's high school offered sixty-nine courses. Defendant, pointing to the same exhibit, asserts that there are ninety-four courses offered. The discrepancy appears to stem in part from whether separate sections of the same course are treated as separate course offerings.  The difference is not material to the outcome of the case.

associated with student achievement. Plaintiffs' expert opined that education spending in Vermont, and at Twin Valley specifically, is above the threshold at which increases in spending are associated with increases in student performance. He agreed that at the current level of spending in Vermont, more spending did not create higher levels of educational opportunity.

¶ 15. Seth Boyd, a Twin Valley school board member and the Town's designated representative under Vermont Rule of Civil Procedure 30(b)(6), testified at deposition that the district's relatively high per-pupil spending was attributable to student needs, demographics, special education costs, facility bond payments of over $500,000 per year, and transportation costs. He opined that there was a need for additional opportunities for Twin Valley students. Boyd and other witnesses testified that districts the size of Twin Valley do not have the benefit of some economies of scale that are available to larger schools because the costs of maintaining required staff such as principals, nurses, and librarians, are spread over fewer students. In addition, they asserted that Twin Valley incurs higher costs for transportation than many schools due to geography and other factors.

¶ 16. According to data from the Vermont Agency of Education, in fiscal year 2018, Whitingham had 182.56 equalized pupils, $20,981.32 in "budgets per equalized pupil," and education spending of $19,982.75 per equalized pupil. This placed Whitingham third in the state in education spending per equalized pupil. Whitingham's homestead equalized tax rate in 2018 was 2.0974, also among the highest in the state. A Whitingham selectboard member asserted that the Town could not impose higher local taxes to support local infrastructure and services because its education taxes were already so high.

¶ 17. Plaintiff Madeleine Klein owns a home and forty-one acres of land in Whitingham. Her property's assessed value increased from $241,800 in 2007 to $379,800 between 2010 and 2015, then decreased to $361,900 in 2016 and 2017. Over this period, her assessed property education tax ranged from $3513 to $5320. She was eligible for an income-sensitivity tax

adjustment, which reduced her actual education property tax payment to approximately $3000-$4200 per year.[3] She struggles each year to pay her taxes.

## III.  Analysis

¶ 18.  Plaintiffs argue that the civil division erred in granting summary judgment to the State because there is a genuine dispute regarding whether Whitingham students such as plaintiff Boyd are deprived of equal educational opportunities.  Plaintiffs further argue that they provided sufficient evidence to prove that the State's education property taxation system requires plaintiff Klein to make a disproportionate contribution to the funding of education in Vermont because she pays more in education property taxes than similarly situated taxpayers in other towns.  Finally, plaintiffs claim that the court improperly granted summary judgment on the Town's claims because they presented evidence that the taxation scheme harms the Town by depriving it of revenue and compels the Town to collect an unconstitutional tax from its revenue.

¶ 19.  On appeal from a decision granting summary judgment, we review the evidence and law without deference, applying the same standard as the superior court.  Newton v. Preseau, 2020 VT 50, ¶ 4, 212 Vt. 445, 236 A.3d 1270.  "Summary judgment is appropriate when, construing the facts as alleged by the nonmoving party and resolving reasonable doubts and inferences in favor of the nonmoving party, there are no genuine issues of material fact and judgment is appropriate as a matter of law."  Sheldon v. Ruggiero, 2018 VT 125, ¶ 14, 209 Vt. 33, 202 A.3d 241.  "Where the moving party does not bear the burden of persuasion at trial, it may satisfy its burden of production by showing the court that there is an absence of evidence in the record to support the nonmoving party's case."  Ross v. Times Mirror, Inc., 164 Vt. 13, 18, 665 A.2d 580, 583 (1995).  The nonmoving party must then show  that there are material facts in

_____

[3]  Certain taxpayers are entitled to a "homestead property tax income sensitivity adjustment."  32 V.S.A. ch. 154.  The adjustment applies only to a property owner's "housesite," which includes no more than two acres surrounding the property owner's dwelling. Id. §§ 6061(11), 6066.

dispute. Id. "Evidence which merely makes it possible for the fact in issue to be as alleged, or which raises a mere conjecture, surmise or suspicion is an insufficient foundation for a verdict." Fuller v. City of Rutland, 122 Vt. 284, 289, 171 A.2d 58, 61 (1961). "[W]here the jury could only find for the plaintiff by relying on speculation, the defendant is entitled to judgment." Bernasconi v. City of Barre, 2019 VT 6, ¶ 11, 209 Vt. 419, 206 A.3d 720.

¶ 20.  As discussed below, we agree with the civil division that plaintiffs failed to present evidence sufficient for a jury to find that the current statewide education funding system deprived plaintiff Boyd of a substantially equal educational opportunity.  We conclude that plaintiffs likewise failed to demonstrate that the property education taxation system arbitrarily discriminates against plaintiff Klein.  Because plaintiffs have not met their burden of proving that the current education taxation scheme is unconstitutional, the Town's claims that it is being compelled to collect an unconstitutional tax and is deprived of revenue by that tax necessarily fail as well.

A. Equal Educational Opportunity Claim

¶ 21.  We first address plaintiffs' argument regarding the proper constitutional analysis to be applied to their claim that the State's education funding system deprives plaintiff Boyd of an equal educational opportunity.  According to plaintiffs, Brigham I held that equal education opportunity is a fundamental right and therefore the challenged statutes are subject to strict scrutiny.  The State responds that, although framed as a challenge to the education funding system, what plaintiffs are really complaining about is the property taxation system, and therefore we should review their claim using a rational-basis standard.

¶ 22.  We need not resolve this dispute because we conclude that under any standard, plaintiffs have failed to provide evidence sufficient to show that the existing statewide education funding and taxation scheme is to blame for the number of courses and sports offered at Twin Valley or its students' relatively poor performance in testing and attendance.

¶ 23. Statutes are presumed to be constitutional and reasonable. Badgley v. Walton, 2010 VT 68, ¶ 20, 188 Vt. 367, 10 A.3d 469. "In an action challenging a legislative enactment on the basis of equal protection, one who seeks to void such an enactment on equal protection grounds undertakes a very weighty burden." Colchester Fire Dist. No. 2 v. Sharrow, 145 Vt. 195, 199, 485 A.2d 134, 137 (1984) (quotation omitted).

¶ 24. Viewed in the light most favorable to plaintiffs, the limited evidence they presented showed that between 2016 to 2019, Twin Valley offered approximately half as many in-person courses as the largest high school in the state. Its students had access to many other in-person and online courses at nearby institutions. Its students performed somewhat worse than the statewide average in testing and attendance. At least one student, plaintiff Boyd, would have preferred to have more in-person course options and more extracurricular sports.

¶ 25. Assuming for the purposes of summary judgment that these facts are sufficient to establish a claim that plaintiff Boyd or her fellow students were denied substantially equal educational opportunities, plaintiffs have failed to demonstrate that the deprivation was caused by the State's current educational funding and taxation system. The facts of this case are a far cry from Brigham I, where there was overwhelming evidence that school districts in property-poor towns spent far less per pupil than districts in wealthy areas, resulting in vast inequality of educational opportunities between students in rich and poor towns. By contrast, the evidence here shows that Twin Valley's per-pupil spending is nearly the highest in the State, despite having average property values. During the years at issue, it spent approximately $3600 more per pupil than the statewide average, and $4000 more per pupil than other districts of a similar size. Plaintiffs' own expert testified that education spending at Twin Valley is above the threshold at which increases in spending are associated with increases in student performance. He agreed that at the current level of spending, more spending would not create higher levels of educational opportunity. Thus, unlike in Brigham I, it is not obvious that more spending in Twin Valley would

10

translate to better opportunities for students. The record reveals no clear link between the way the State currently funds public education and Twin Valley's alleged deficiencies.

¶ 26. Plaintiffs argue that the Town's Rule 30(b)(6) witness, Seth Boyd, opined that the "funding formula that is hinged on per-pupil spending doesn't allow the midsize or smaller schools to take advantage of the economies of scale" available to larger districts. They argue that this demonstrates that the current system requires Whitingham to spend more to get the same services, thereby denying Whitingham students equal educational opportunities. However, this conclusory statement was unsupported by any specific facts or expert testimony and was therefore insufficient to defeat summary judgment. See Starr Farm Beach Campowners Ass'n v. Boylan, 174 Vt. 503, 506, 811 A.2d 155, 160 (2002) (mem.) ("Testimony which presents nothing but conclusions is insufficient to defeat a motion for summary judgment.").

¶ 27. The record also does not support plaintiffs' argument that, but for the excess-spending penalties imposed by the State, the Twin Valley district would have additional funding that it would use to improve educational opportunities for students. Plaintiffs presented no evidence that Twin Valley would have offered the in-person courses or sports desired by plaintiff Boyd, or other opportunities not currently available, if the district had not been subject to the penalties. The fact that Twin Valley, a relatively small high school, offers fewer courses and sports may simply reflect a lack of interest or an insufficient number of students to justify offering them. The evidence connecting the alleged shortcomings of the Twin Valley school to the way the State currently funds public education is simply too tenuous to support plaintiffs' claim.

¶ 28. Plaintiffs argue that in Brigham v. State (Brigham II), 2005 VT 105, ¶ 13, 179 Vt. 525, 889 A.2d 715 (mem.), we held that the plaintiff students adequately stated a claim that they were being denied equal educational opportunities by alleging that the State provided inadequate funding to the Whitingham school, resulting in a limited curriculum compared to students at larger high schools. While such allegations may have been sufficient to withstand a motion to dismiss,

11

at the summary judgment stage it was plaintiffs' burden to put forth admissible evidence to support their allegations. Mello v. Cohen, 168 Vt. 639, 641, 724 A.2d 471, 474 (1998) (mem.) ("Even though a plaintiff's allegations present a cognizable claim sufficient to withstand a motion to dismiss, the same allegations may well prove insufficient to withstand a motion for summary judgment."). As noted above, the only evidence presented by plaintiffs in support of this argument was that Twin Valley, which spends more per pupil than most schools in Vermont, offers fewer courses than the largest high school in the state. But this disparity may simply be due to inherent "differences among school districts in terms of size," which we have recognized "will invariably create unavoidable differences in per-pupil expenditures" and, by extension, educational opportunities. Brigham I, 166 Vt. at 268, 692 A.2d at 397. The record here is simply insufficient to show that the current statewide funding model is the reason for Twin Valley's alleged deficiencies. Accordingly, the court properly granted the State's motion for summary judgment.

## B. Proportional-Contribution Claim

¶ 29. We next address plaintiff Klein's claim that the education property taxation system violates the Vermont Constitution's Proportional Contribution Clause because it requires her to pay a disproportionate contribution to the funding of education in Vermont. The Proportional Contribution Clause provides "[t]hat every member of society hath a right to be protected in the enjoyment of life, liberty, and property, and therefore is bound to contribute the member's proportion towards the expence of that protection." Vt. Const. ch. I, art. 9. The clause "establish[es] two fundamental requirements for the valid imposition of taxes in Vermont: first, that any legislative classification of taxpayers bear a reasonable relation to the purpose for which it is established; and second, that the classification scheme be fairly and equitably applied among like classes of taxpayers." In re Prop. of One Church St. City of Burlington, 152 Vt. 260, 266, 565 A.2d 1349, 1352 (1989).

12

¶ 30. We have recognized that "reasonable schemes of taxation must have flexibility, and some difference of treatment between citizens is virtually inevitable." Schievella v. Dep't of Taxes, 171 Vt. 591, 593, 765 A.2d 479, 482 (2000) (mem.). Accordingly, in assessing the validity of a taxation scheme under the Proportional Contribution clause, we apply a rational-basis test. Town of Castleton v. Parento, 2009 VT 65, ¶ 10, 186 Vt. 616, 988 A.2d 158 (mem.). To prevail on their proportional-contribution claim, plaintiffs must show that the government "arbitrarily treated similarly situated taxpayers differently." Id. But "[i]f there is a rational basis for the distinctions, serving a legitimate policy objective, there is no equal protection violation. In applying this standard, we must look at any of the purposes that are conceivably behind the statute." Alexander v. Town of Barton, 152 Vt. 148, 157, 565 A.2d 1294, 1299 (1989) (quotation omitted).

¶ 31. We conclude that the trial court properly granted summary judgment to the State on plaintiffs' proportional-contribution claim because they failed to demonstrate that plaintiff Klein was treated differently than other similarly situated taxpayers. Plaintiffs proffered very little evidence in support of their claim. They relied primarily on data showing that Whitingham had one of the highest education property tax rates in the State in 2018 because of its high per-pupil spending. However, the fact that a town has a high tax rate does not necessarily mean that a particular resident pays more taxes, in dollar terms, than similarly situated residents in other towns. The amount of education tax paid depends on the value of the property, the income level of the owner, the local per-pupil spending amount, and other factors. Here, the evidence is that plaintiff Klein paid approximately $2000 per year after credits on her housesite, and an additional $1000-$2200 per year on the 39 acres surrounding her housesite, for a total education tax of approximately $4000 per year. Without an analysis of property tax rates, education spending, property values, and income levels in other towns, we are left to speculate about how Klein's tax burden compared to similarly situated individuals in those towns. And given the complexity of the education

13

property taxation scheme, we conclude that it would not be reasonable for a jury to simply infer from this evidence that plaintiff Klein is treated differently than others like her. See Bernasconi, 2019 VT 6, ¶ 11 ("[W]here the jury could only find for the plaintiff by relying on speculation, the defendant is entitled to judgment."); Mello, 168 Vt. at 641, 724 A.2d at 474 ("[T]o defend against a summary judgment motion, a plaintiff cannot rely on conclusory allegations or mere conjecture.").

¶ 32.    Furthermore, to the extent that plaintiff Klein's claim is based on the fact that the education property taxation scheme requires residents of high-spending school districts like Twin Valley to pay an excess-spending penalty, which in turn drives up their education property tax rate, we agree with the trial court that plaintiffs failed to show this classification is invalid. See Schievella, 171 Vt. at 594, 765 A.2d at 483 (explaining that when challenging constitutionality of tax statute, "plaintiffs' burden is to show that every conceivable basis for the legislative classification is invalid" (quotation omitted)). The Legislature may have properly concluded that the excess-spending penalty was necessary to allow districts to continue to exercise local control over their budgets, while at the same time equalizing inter-district spending by requiring high-spending districts to contribute to districts that could not afford to spend as much. See Brigham I, 166 Vt. at 265, 692 A.2d at 396 (describing local control as "laudable goal" but requiring State to ensure access to substantially similar per-pupil spending). The Legislature could also have concluded that because the State now funds the entirety of school district budgets, an excess-spending penalty was necessary to encourage districts to control their overall spending and avoid depleting the Education Fund. See Holton v. Dep't of Emp. & Training, 2005 VT 42, ¶ 30, 178 Vt. 147, 878 A.2d 1051 (holding that "ensur[ing] the financial integrity and liquidity of" state unemployment compensation fund was legitimate governmental interest). These are legitimate governmental interests that support the disparate treatment of residents in high-spending districts.

14

For these reasons, we conclude that the court properly granted summary judgment to the State on plaintiffs' proportional-contribution claim.

## C. The Town's Claims

¶ 33.    We turn to whether the court properly granted summary judgment to the State on the Town of Whitingham's claims.  Plaintiffs alleged that the State's unconstitutional property taxation scheme harmed the Town by depriving it of revenue and forced the Town to collect an illegal tax from its residents.  The trial court concluded that the Town's claims failed because plaintiffs failed to establish as a threshold matter that the property education tax statutes were unconstitutional, and the Town otherwise lacked capacity to sue the State.  We agree.

¶ 34.    Capacity is "defined as a party's personal right to come into court and is usually conceived of as a procedural issue dealing with the personal qualifications of a party to litigate." Town of Andover v. State, 170 Vt. 552, 553, 742 A.2d 756, 757 (1999) (mem.) (quotation omitted). "[T]he traditional principle throughout the United States has been that municipalities and other local governmental corporate entities and their officers lack capacity to mount constitutional challenges to acts of the State and State legislation." City of New York v. State, 655 N.E.2d 649, 651 (N.Y. 1995).  This Court has recognized an exception to the general rule barring local government challenges to state legislation "where municipalities assert that compliance with a state statute will force them to violate the constitution." Town of Andover, 170 Vt. at 553, 742 A.2d at 757. Plaintiffs argue that the Town falls within this exception because the State's education tax laws require it to collect an unconstitutional tax from its residents.  According to plaintiffs, the Town could be subject to liability for the allegedly unconstitutional education taxation system because the law permits the Town to retain 0.225 of one percent of the total education tax it collects if it timely remits payment to the State Treasurer.  See 32 V.S.A. § 5402(c).  Plaintiffs further claim that the allegedly unconstitutional taxation system harms the Town by depriving it of

15

revenue because Whitingham taxpayers are unwilling to pay more for town services on top of their existing education tax burden.

¶ 35. The trial court properly granted summary judgment to the State on the Town's claims. The Town's claims are based on the premise that the education property taxation and funding scheme is unconstitutional because it deprives Whitingham students of equal educational opportunities and requires Whitingham taxpayers to pay a disproportionate amount of taxes. As discussed above, plaintiffs failed to put forth evidence sufficient for a jury to find in their favor on these constitutional challenges. Because plaintiffs did not establish their underlying claims that the education property taxation scheme is unconstitutional, the Town's derivative claims likewise fail.

Affirmed.

FOR THE COURT:

Associate Justice