Filed 12/30/25

VERMONT SUPERIOR COURT
Windsor Unit
12 The Green
Woodstock VT 05091
802-457-2121
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 405-9-17 Wrcv

| Roback et al vs. Washington County Railroad Co. |
| --- |

## ENTRY REGARDING MOTION

Title:    Motion for Summary Judgment; (Motion: 32)
           Motion for Summary Judgment; (Motion #33)
Filer:    Marie C. Horbar, Esq. for State of Vermont
           Peter F. Young, Esq. for Washington County Railroad Company
Filed Date:    June 20, 2025; June 21, 2025

### DECISION AND ORDER ON
### DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs John Roback and Gail Langeloh assert claims seeking damages from Defendants Washington County Railroad Company ("Railroad") and the State of Vermont ("State"). The Defendants now move, separately, for a summary judgment as to each of the claims pled against them.

Plaintiffs are represented by Claudine C. Safar, Esq. The Railroad is represented by Peter F. Young, Esq., and the State is represented by Assistant Attorney General Marie Horbar, Esq. For reasons that follow, Defendants' motions are granted.

### Procedural Background

This case is now more than eight years old and has an unusual procedural history. The Court will presume familiarity with that history, as set forth in the Court's decision filed on March 25, 2025, and provides only additional relevant background here.

Through an Amended Complaint filed in April of 2018, Plaintiffs brought the following claims against the State:

1. In Count II, Plaintiffs challenged an August 2017 decision of the State Board of Transportation to close the railroad crossing at issue here, as lacking sufficient factual findings.

2. In Count III, Plaintiffs asserted that the State breached a contractual obligation, set forth in an easement by deed granted long ago by the State's contractual predecessor to Plaintiffs' predecessors, which requires the State to maintain the easement or crossing.

3. In Count IV, Plaintiffs asserted a claim entitled "bad faith," alleging that the State intentionally or recklessly breached a duty to owed to Plaintiffs, by not preventing the Railroad, the State's lessee, from taking steps to close the crossing.

4. In Count V, Plaintiffs asserted that the State violated the implied covenant of good faith and fair dealing, by failing to maintain the easement, by allowing the Railroad to close the easement, and by acquiescing to the Railroad's actions.

The State now seeks summary judgment as to all four claims. However, Plaintiffs conceded in their opposition brief that Count II of their Amended Complaint is now moot, and they do not offer any opposition to the motion on that Count. The Court will therefore grant the State's motion on that claim, leaving only three claims against the State for analysis.

Count VI of Plaintiffs' Amended Complaint asserts the lone claim in this case against the Railroad: for tortious interference with contractual relations, by inducing or otherwise causing the State to fail to perform contractual duties owed to Plaintiffs. The Railroad now seeks summary judgment on that claim.

## Standard of Review

"Summary judgment is appropriate when, construing the facts as alleged by the nonmoving party and resolving reasonable doubts and inferences in favor of the nonmoving party, there are no genuine issues of material fact and judgment is appropriate as a matter of law." *Dewdney v. Duncan*, 2025 VT 26, ¶ 8, 342 A.3d 818 (quotation marks omitted). "When reviewing such a motion, [the Court] "regard[s] as true all allegations of the nonmoving party supported by admissible evidence and give[s] the nonmoving party the benefit of all reasonable doubts and inferences." *Id.* (quotation marks omitted).

Where, as here, parties are moving for summary judgment on claims on which the movants would not bear the burden of persuasion at trial, the movants "may satisfy [their] burden of production by showing the court that there is an absence of evidence in the record to support the nonmoving party's case." *Caldwell v. Champlain Coll. Inc.*, 2025 VT 17, ¶ 7, 336 A.3d 423. If that initial burden is met by the movant, the nonmovant may not rest on mere allegations, but instead must respond "with specific facts raising a triable issue." *Id.* (quotation marks omitted); *see Gross v. Turner*, 2018 VT 80, ¶ 8, 208 Vt. 112; *Clayton v. Unsworth*, 2010 VT 84, ¶ 16, 188 Vt. 432. "'Summary judgment is mandated where, after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which the party has the burden of proof at trial.'" *Id.* (quoting *Burgess v. Lamoille Hous. P'ship*, 2016 VT 31, ¶ 17, 201 Vt. 450). "[W]here the jury could only find for the plaintiff by relying on speculation, the defendant is entitled to [summary] judgment." *Boyd v. State*, 2022 VT 12, ¶ 19, 216 Vt. 272.

## Analysis

I. The State's Motion for Summary Judgment

A.  Claim for Breach of Contract

The contract at issue in this case is an easement by deed, formed in 1911 by and between the State's predecessor in interest, Boston & Maine Railroad, to Plaintiffs' predecessors, private landowners known as the Eastmans.  The State presently owns the rail line and lands running beneath it, which had been owned by Boston & Maine in 1911.[1]  Plaintiffs presently own and reside on lands in the Town of Norwich, formerly owned by the Eastmans, which is located easterly and immediately adjacent and to the rail line, which runs approximately north-south.  The 1911 deed was created in response to an order of the State Public Service Commission, which had "ordered the abolishment" of two railroad crossings, and a portion of a public highway to the east of the rail line, each of which had served and benefitted the Eastmans.  State's Ex. 1, at 1 (recital clause of 1911 deed, explaining Commission's order).  In return for the Eastmans' loss of rights, Boston & Maine agreed under the new deed to "construct and maintain a farm crossing," traveling over the railroad line, near the Eastmans' residence.  *Id.* at 2.  Further, Boston & Maine agreed to construct a short road, one rod wide, connecting the new crossing with a proposed public highway to be located to the west of the rail line.[2]  Boston & Maine also agreed to construct a short continuation of this road, running from the new crossing towards the east, to its connection with the existing highway that ran by the Eastmans' property.  The deed further indicated that the new road and crossing were to be located as shown on a blueprint filed with the Public Service Commission.  *See id.*  Notably, the deed further stated, about the new crossing and the new road giving access to the crossing:

> said road and crossing to be for *the use* of said Eastmans, their heirs and assigns and for *the use* of other persons now and hereafter owning or occupying the residences and lands on the easterly side of said Railroad.

*Id.* (emphasis added).

In the instant case, Plaintiffs claim that for more than 100 years, the State and its predecessor failed to perform any maintenance of the crossing, thus constituting breach of contract.  Plaintiffs also claim that, because of this breach, the crossing became unsafe for use by motorists, a condition that prompted the State's transportation safety regulator, the State Board of Transportation, to order permanent closure of the crossing in 2017.

The essential elements of a claim for breach of contract are: (1) existence of a valid contract, *see Sutton v. Vt. Reg'l Ctr.*, 2019 VT 71A, ¶¶ 59-60, 212 Vt. 612; (2) plaintiff's performance or a showing of a willingness and ability to perform the plaintiff's contractual obligations, *see Margolis v. Daily Direct, LLC*, 2023 VT 20, ¶ 8, 218 Vt. 31; (3) breach by the defendant, *see Beldock v. VWSD, LLC*, 2023 VT 35, ¶¶ 23-27, 218 Vt. 144; and (4) damages as a result of defendant's breach, *see Smith v. Country Vill. Int'l, Inc.*, 2007 VT 123, ¶ 9, 183 Vt. 535 (mem.).  Here, the State moves for summary judgment under first, third, and fourth elements.  Its primary argument is that the easement by deed is illegal and void, as against the transportation

_____

[1] The State leases this property to the Railroad, which actively operates a railroad on the property.
[2] This proposed highway is known today as Vermont Route 5.

safety policies of the State, as reflected in the Board's order to permanently close the crossing. The Court does not agree with this particular argument, and grants the State's motion on other grounds, as explained later in this decision. The Court begins with an analysis of the State's primary argument, however, even though it is not the basis for which the Court grants the State's motion on the breach of contract claim, as the Court believes its discussion sheds helpful light on how the Court interprets the obligations created by the easement by deed.

Where an express easement by deed, as here, "unambiguously limits and defines a right-of-way," the court interpreting the deed must "enforce the deed as written," in accordance with its "'plain meaning.'" *Gladchun v. Eramo*, 2023 VT 5, ¶ 17, 217 Vt. 481 (quoting *Beldock v. Town of Charlotte*, 2010 VT 74, ¶ 11, 188 Vt. 345); *see Restatement (Third) of Property: Servitudes* § 4.1(1) (2000) (servitudes, including easements running with the land, "should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument . . . and to carry out the purpose for which it was created"); 3 *Tiffany Real Property* § 802 (3d ed.) ("In the case of easement by express grant, . . . the rights and liabilities of parties are determined by the terms of agreement."). Here, the plain terms of the easement by deed impose a duty on the servient estate (now owed by the State) to maintain the crossing, which duty is met so long as such maintenance is adequate to allow "use" of the crossing or easement by the dominant estate (now held by Plaintiffs). The duty is not an absolute, or strict liability duty—*i.e.*, not a duty of "maintenance for maintenance's sake." Thus, if the manner or extent of maintenance, for example, deprives or interferes with Plaintiffs' use of the easement, such as by causing or allowing conditions at the rail crossing to deteriorate to warrant its permanent closure by transportation safety regulators, the duty of maintenance will not have been met.

This construction of the State's duty of performance aligns with the law of the case. As the Court held earlier in this case, the State is obligated "to perform such maintenance and related work at the crossing as is necessary to maintain compliance with safety standards." Decision & Orders on Cross Motions for Summ. J. – Stay of Proceedings – Order to Mediate (filed Feb. 22, 2022), at 7; *see also id.* (State has prospective obligation to perform maintenance and repairs if such "will operate to bring the crossing into compliance with safety standards").[3]

The State now contends that the easement by deed is illegal and unenforceable, because it violates the transportation safety policies of the State. The State sees a conflict between the easement, which plainly allows use of the crossing, and the Board's order, which prohibits such use. The State argues that this conflict renders the easement by deed void, as against the public policies of the State (as reflected the Board's order). Notably, the State's position, while taken in litigation, is also reflected in the administrative record created by the Board. *See* Decision on Appeal (Mar. 25, 2025) at 5 ("the record establishes that the board considered plaintiffs' deeded rights but found plaintiffs' private interests to be *outweighed by* the safety concerns presented").

---

[3] To this statement of the law the Court could have added, "or perform such maintenance as is necessary to otherwise allow use of the crossing by Plaintiffs and their neighbors," but since the Plaintiffs' inability to use the crossing was due for safety-related reasons, the Court's earlier declaration of the law was properly specific to the circumstances.

The Court does not agree with the State's interpretation of the easement by deed. "Unless the *purpose* for which the [easement] is created violates public policy, and unless contrary to the *intent* of the parties, a[n easement] should be interpreted to avoid violating public policy." *Restatement (Third) of Property: Servitudes* § 4.1(2) (emphasis added). Further, "[a]mong reasonable interpretations, that which is more consonant with public policy should be preferred." *Id.* Here, there is clearly no indication from the easement's terms or otherwise that it was created with the intent or for the purpose of allowing any use of the crossing that would violate or contravene public policy, including transportation safety policies. Indeed, the 1911 easement itself indicates that it was created in response to an order of the State's Public Service Commission, and not with the intent or purpose of violating any state law or policy.

Moreover, even assuming it is reasonable to conclude that the contracting parties intended for the easement to grant or allow violations of public policy by Plaintiffs or others, another reasonable interpretation, one that finds no such unlawful intent or purpose, is also reasonable and is favored, as the *Restatement* indicates. The Board, and now the State in its motion, have taken the view that Plaintiffs' private easement rights are "outweighed" or superseded in favor of *conflicting* public policies regarding transportation safety, but that interpretation mistakenly supposes that the easement by deed sought to grant the dominant estate a right of use notwithstanding applicable public policies to the contrary. In short, the easement by deed has never been void as *against* public policy because, properly interpreted, it is consonant *with* that policy.

Further, the Court does not find illegal the promise by the State's contractual predecessor to maintain the railroad crossing, even though the performance of that promise at this point (post-closure) may be impossible in fact, if not without purpose. Indeed, a contractual defense arising from the Board's closure order might have been asserted under the doctrine of impracticability or frustration of purpose. *See, e.g.*, *Burt v. Bd. of Trustees of Univ. of R.I.*, 84 F.4th 42, 53-54, 57-58 (1st Cir. 2023) (Covid-19 closure order by public health authorities was an event, the non-occurrence of which was a basic assumption on which public university's contract to provide on-campus, in-person instruction was made, which discharged as impracticable the university's obligation) (citing *Restatement (Second) of Contracts* § 264). However, that defense is generally considered an affirmative defense, *see* 30 *Willison on Contracts* § 77:7 (4th ed.), and it was not pled by the State or even argued in its motion.

As noted above, in addition to moving for judgment for lack of a valid, enforceable contract, the State moves for summary judgment by arguing, *inter alia*, that there is insufficient evidence to satisfy Plaintiffs' burden on the essential elements of contractual breach and damages. Starting with breach, the Court agrees that Plaintiffs have failed to meet their burden because they have failed to come forward with evidence that would be sufficient for a reasonable fact-finder, even granting Plaintiffs all favorable inferences, to conclude that the State failed to perform maintenance so as to cause or allow conditions at the crossing to become so unsafe as to warrant its closure by regulators.

To begin, Plaintiffs' opposition indicates that they "will present evidence at trial that the State failed to maintain the crossing for over 100 years and that [Plaintiffs] suffered damages as a

result." Pls.' Opp'n to State & Railroad's Mots. for Summ. J. (filed July 28, 2025), at 10. That does nothing to meet Plaintiffs' burden on the issue of breach. *See Caldwell*, 2025 VT 17, ¶ 7.

Alternatively, Plaintiffs seek to prove a lack of maintenance by relying on factual findings made by the Transportation Board in its 2017 Order. *See* Pls.' Opp'n at 9 ("[T]he Transportation Board has already found that 'the railroad neglected this crossing and allowed the above-described unsafe situation to persist.'" (quoting 2017 Board Order, at 10)). However, such reliance is misplaced.[4] The Board's 2017 Order was reversed and remanded by this Court in 2022. On remand, the Board issued a second order, in December of 2023, that clearly and decisively concluded that no amount of maintenance, repairs, or similar work would make the railroad crossing safe for use by motorists. The Board also held that a duty of maintenance, with respect to the crossing, is not a duty to redesign, reconstruct, or materially upgrade the crossing. The Board's 2023 Order was affirmed in all respects by this Court, in March of 2025. No reasonable factfinder, relying on the findings in the Board's 2023 Order, and construing all reasonable doubts and inferences in Plaintiffs' favor, could conclude that the State's acts or omissions with regard to maintenance of the crossing caused or contributed to the conditions at the crossing that made it unsafe and warranted its closure.

Since, as noted above, the State's contractual obligation was to maintain the crossing sufficient to permit its use, and because the crossing was closed for reasons *other than* inadequate maintenance, the State breached no duty of performance under the easement by deed. Accordingly, the State is due summary judgment on the breach of contract claim.

Turning to the issue of damages, the Court reaches the same conclusion, in that Plaintiffs have failed to meet their evidentiary burden for purposes of Rule 56. On a claim for breach of contract, "[t]wo types of damages are recoverable: 'direct damages that naturally and usually flow from the breach itself, and special or consequential damages, which must pass the tests of causation, certainty, and foreseeability.'" *Smith*, 2007 VT 132, ¶ 9 (quoting *Waterbury Feed Co., LLC v. O'Neil*, 2006 VT 126, ¶ 25, 181 Vt. 535 (mem.)). Where actual monetary damages are sought, there must be evidence of their existence and extent, and sufficient data or information from which the amount of damages can be computed or reasonably ascertained. *See* 24 *Williston on Contracts* § 64:12 (4th ed.). "The amount of damages must be proven with reasonable, not absolute, certainty," and generally speaking, "the exact amount need not be shown, since mathematical precision is not required." *Id.*; *see Waterbury Feed*, 2006 VT 126, ¶ 27 ("damages may be given in approximate amounts" (citing *A. Brown, Inc. v. Vt. Justin Corp.*, 148 Vt. 192, 196 (1987)); *Tour Costa Rica v. Country Walkers*, 171 Vt. 116, 127 (2000) (only where "the character of the damages is such as to be capable of being estimated by a strict money standard" must the plaintiff "give evidence thereof in dollars and cents").

Here, if the State breached the easement by deed, Plaintiffs have failed to show any resulting economic injuries or losses, whether direct or consequential. For example, it appears that Plaintiffs might have suffered a direct economic injury, such as the diminution of fair market

---

[4] The parties do not question the admissibility of the Board's findings in a de novo trial in this Court on a claim for breach of contract. The Court will thus treat those findings as admissible, at least for purposes of the pending Rule 56 motions.

value of their real property. They point out that because of the closure of the crossing, they "have had to drive a longer distance several times per day for years," and "they are now subject to being trapped by flood waters as a result of losing a way out of their home." Pls.' Opp'n at 16. It is not unreasonable to think that those changes or new circumstances, resulting from the closure of the crossing, might decrease the fair market value of residential real estate owned by Plaintiffs.

Yet, Plaintiffs' Rule 56(c)(2) statements cite to no evidence, whether an appraisal or other form of estimate, showing the loss in value of their respective real properties, resulting from the State's supposed breach.[5] Plaintiffs merely state in their brief that they "will present evidence at trial in support of damages." *Id.* That is plainly insufficient for purposes of Rule 56. *See Caldwell*, 2025 VT 17, ¶ 7.

Plaintiffs also claim consequential damages arising from the State's supposed breach, such as attorney's fees that Plaintiffs have incurred in petitioning the Board for relief and in litigating the instant case. *See* Pls.' Opp'n at 16. Again, however, Plaintiffs have presented no evidence—*e.g.*, no invoices, billing records, receipts, transaction histories, or other records— showing in dollars and cents the amount of attorney's fees and related costs that they have incurred. Nor have they even presented an affidavit, from Plaintiffs themselves or their attorneys, setting forth upon personal knowledge an estimate or approximation of the dollar amount incurred. As for other consequential damages, perhaps the actual costs of increased driving would count as such, but again, there is no proof offered as to such costs.

Accordingly, Plaintiffs have failed to meet their burden on damages, and summary judgment is therefore warranted in the State's favor on the claim for breach of contract.

### B. Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

As a matter of public policy there is implied in every contract in Vermont a covenant of good faith and fair dealing. *See Carmichael v. Adirondack Bottled Gas Corp. of Vt.*, 161 Vt. 200, 208 (1993). An action for a breach of this covenant sounds in tort, not contract. *Id.* The covenant rests on the principle "that each party promises not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement." *Id.* "The implied promise by

---

[5] In their briefs, the parties dispute whether Plaintiffs ever petitioned or supplied evidence to the Board, sufficient to justify the Board's determination and award of *statutory* damages. The Board indicated in its 1997 order that, pursuant to 5 V.S.A. §§ 3639-40, it may award compensatory damages to a party whose property rights are adversely affected by a permanent closure of a railroad crossing. But statutory damages are distinct from contract damages. The former is compensation for the public use (or condemnation) of private property, and the latter is compensation for all direct and consequential injuries or losses proximately caused by another's breach of contract. And the issue before the Court presently is whether Plaintiffs, as nonmovants with the burden of proof at trial on the issue of *contract* damages, have presented sufficient evidence on that issue to warrant a trial. Therefore, the parties' simmering dispute as to whether Plaintiffs took proper steps to warrant a statutory damages award from the Board is not before the Court at this time.

its nature protects against 'a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness.'" *Id.* at 208-09 (quoting *Restatement (Second) of Contracts* § 205 cmt. a). The question whether the implied covenant has been breached is "usually a question of fact for a jury." *Boulton v. CLD Consulting Eng'rs, Inc.*, 2003 VT 72, ¶ 12, 175 Vt. 413. Notably, there is no "separate cause of action for breach of the implied covenant of good faith and fair dealing when the plaintiff pleads breach of contract *based upon the same conduct.*" *Tanzer v. MyWebGrocer, Inc.*, 2018 VT 124, ¶ 33, 209 Vt. 244 (quotation marks omitted). The Court concludes that Plaintiffs have not come close to meeting their evidentiary burden on this claim.

First, to the extent the claim is premised on the State's supposed failure to maintain the crossing, *see* Pls.' Opp'n at 12, it is based on the same conduct for which Plaintiffs assert a separate claim for breach of contract, and is barred for that reason. *See Tanzer*, *supra*.

Second, Plaintiffs' claim is otherwise largely premised on the State's inaction with regard to unilateral conduct of its lessee, the Railroad.[6] In early February of 2017, the Railroad closed the rail crossing without first seeking an agreement for closure from Plaintiffs or others, and without petitioning the State Transportation Board for a closure order. The Railroad performed this initial closure by giving Plaintiffs and other affected residents a written notice explaining the Railroad's safety-related concerns, and then almost immediately thereafter installing a physical blockade of the crossing. By not seeking an agreement from affected landowners or petitioning the Board, the Railroad's actions violated 5 V.S.A. § 3639(a), which requires such procedural steps to be taken by a party seeking to close a railroad crossing. Indeed, the Board found the Railroad liable for those two violations and for each violation ordered the Railroad to pay the maximum civil fine permitted by statute, 5 V.S.A. § 3639(b). Notably, in addition to authorizing civil fines, the statute also affords "any person aggrieved by such" procedural violations a right to bring a private action to "recover the person's damages." *Id.* Plaintiffs failed to bring such an action in this Court, however. Instead, Plaintiffs now cite the Railroad's statutory violations as evidence that the Railroad (and by extension, the State) violated the implied covenant of good faith and fair dealing.

Granting Plaintiffs the benefit of all reasonable doubts and favorable inferences, the Court does not find that the Railroad's conduct is sufficient to support a claim for breach of the implied covenant. For example, Plaintiffs fail to present evidence that the Railroad (or the State, as "mere bystander") acted with an improper or unreasonable purpose or motive. Plaintiffs "believe that the State has proffered reasons [for the closure] that are pretext and that the State seeks to close the crossing to limit expenditure of funds to update the crossing." Pls.' Rule 56(c)(2) Statement In Response to State, ¶ 14. Plaintiffs similarly suggest that "[i]f the Railroad was concerned about some imminent risk, [it] likely would have taken some advanced steps to make the crossing safer prior to closing the crossing," and that "[t]he lack of any [advanced]

---

[6] Plaintiffs seek to make the State liable for such conduct on the theory that the State was a "mere bystander," Pls.' Opp'n at 12, or "acquiesce[ed] to the Railroad's actions." Am. Compl. ¶ 29. Notably, the State does not argue that it cannot bear direct or vicarious liability, in an action sounding in tort, for what appears to be the Railroad's own, independent conduct.

effort whatsoever demonstrates pretext." Pls.' Rule 56(c)(2) Statement In Response to Railroad, ¶ 23. While the Court is obligated under Rule 56 to grant Plaintiffs all reasonable doubts and inferences, Plaintiffs here are offering only speculation to fill an evidentiary gap, which is an insufficient basis on which to avoid summary judgment. *See Boyd*, 2022 VT 12, ¶ 19; *Palmer v. Furlan*, 2019 VT 42, ¶ 10, 210 Vt. 375.

The record simply does not support a claim of pretext, or other improper motive or purpose. The Railroad's reason for physically closing the crossing, and the reason it advanced when later petitioning the Board for permanent closure, was that it was a public safety risk for reasons that could not be adequately addressed or ameliorated by maintenance work. (The Agency of Transportation, as intervenor in the administrative proceedings, took that same position, though it relied on its own "Highway Crossing Sufficiency Analysis" that the Agency performed in April of 2017.) Soon after the Railroad filed its petition, the State Transportation Board—which generally functions as the "regulatory and quasi-judicial" arm of the Agency of Transportation, 19 V.S.A. § 5(a), and whose members are presumptively knowledgeable about issues "in various areas of the transportation field," 19 V.S.A. § 3—conducted a full-blown evidentiary hearing on the question whether the crossing should be permanently closed, *see id.* § 5(c) (Board adjudications governed by 3 V.S.A. chapter 25). The Board thus took evidence from Plaintiffs (who had separately petitioned for re-opening), the Agency, and the Railroad. In August of 2017, the Board issued an order closing the crossing, in which the Board *agreed with* the Railroad's reasoning and its view of the facts on the ground regarding safety risks. Significantly, the Board, which "presumably possesses expertise" in the "specialized field of transportation" and "in assessing standards for . . . performance" in contracts regarding transportation infrastructure, *Earth Constr., Inc. v. State Agency of Transp.*, 2005 VT 82, ¶ 9, 178 Vt. 620 (mem.), did not find or even suggest that the Railroad's position was pretextual, dishonest, or otherwise in bad faith. This Court eventually affirmed and upheld the Board's reasoning and determination in that regard, as well. As such, the Railroad's actions were certainly not lacking a reasonable basis in fact or regarding transportation safety policy, and they were not shown to be pretextual or otherwise in bad faith.[7] And by extension, even assuming the State may be liable for "acquiescing" to the Railroad's conduct, Plaintiffs' lack sufficient evidence that the State breached the implied covenant of good faith and fair dealing.

---

[7] The Court is aware that Plaintiffs continue to disagree with the findings and the merits of the Board's closure decision, and Plaintiffs still have a right to appeal this Court's order affirming the Board's 2023 closure order. The more relevant point, however, for purposes of a claim alleging "bad faith," is not simply that the Railroad's position was found supported by public policy after a full evidentiary hearing before an administrative body with expertise in transportation safety issues, but that the position was not simply rejected or dismissed as arbitrary, unreasonable, improper, pretextual, or wholly without basis. In short, the Railroad's decision to close the crossing, even if found mistaken as a matter of policy following an appeal and another Board decision on remand, has not been shown in the slightest to have been undertaken in bad faith.

Further, Plaintiffs have not shown how their rights or interests were actually and particularly harmed or undermined because of the Railroad's actions to physically close the crossing without first making efforts to negotiate a closing or petitioning the Board for an order of permanent closure. Parties suing for breach of the implied covenant, like any tort plaintiff seeking compensatory damages, must show actual injuries proximately caused by the tortious conduct of the defendant. There is no evidence in the record indicating how or to what extent Plaintiffs' interests were injured or impaired by the Railroad's violations of the procedural mandates set forth in 5 V.S.A. § 3639(a). Plaintiffs' Rule 56(c)(2) statements point to no evidence that speaks to any injuries particularly arising from the Railroad's (or the State's) supposed bad faith conduct.

Lastly, to the extent Plaintiffs' claim rests on actions or omissions taken solely and directly by the Agency of Transportation or the Transportation Board, the claim also lacks sufficient support. For example, Plaintiffs allege a deprivation of their property without due process and assert that such is proof that the State acted in bad faith. To the contrary, the State afforded Plaintiffs an administrative adjudication in accordance with the Vermont Administrative Procedures Act, 3 V.S.A. chapter 25, and those procedures embody and afford "minimum standards of due process necessary for a fair proceeding." *In re Vt. Health Serv. Corp.*, 155 Vt. 457, 460 (1990); *see also Earth Constr.*, 2005 VT 82, ¶ 7 (listing powers delegated to Board by statute that enable it to "function like a court when dealing with a variety of . . . complicated matters" within its jurisdiction). Further, Plaintiffs were afforded and utilized a right to judicial review of the Board's adjudicatory actions, through which they could have alleged inadequate procedural protections.

Relatedly, if Plaintiffs' theory is that the State has violated due process by engaging in biased or prejudiced decision-making—perhaps in an effort to avoid or nullify the State's own contractual obligations regarding the crossing—Plaintiffs have a steep evidentiary hill to climb. As explained in a leading treatise on administrative law:

> In order to prevail in a claim of bias violating due process, one must show an unacceptable probability of actual bias on the part of those who have actual decision-making power. The general rule requires a presumption of integrity and honesty. Absolute impartiality is not required. An interpretation of events that suggests bias or a hypothetical scenario that conjures up potential bias will not be enough.

2 Charles H. Koch, Jr. & Richard Murphy, *Administrative Law & Practice* § 6:10 (3d ed.) (quotation marks and citations omitted). More generally, "[a]dministrative officials are presumed to be objective and capable of judging particular controversies fairly and on the basis of their own circumstances." *Id.* "Evidence of bias must overcome a presumption of honesty and objectivity." Plaintiffs have made no such showings here, sufficient to prove that the State's decisionmakers (the Board or the Agency of Transportation) were biased or partial. Further, if Plaintiffs are seeking compensatory damages from the State, based on the Board's closure decision—as arbitrary, capricious, biased, or otherwise unlawful—it is doubtful that the State has waived its sovereign immunity from damages claims based on such regulatory actions or decisions.

In conclusion, therefore, while breach of the implied covenant is usually a question of fact, there is an insufficient evidentiary basis on which a jury, resolving all reasonable doubts and drawing all reasonable inferences of fact in Plaintiffs' favor, could determine that the covenant had been breached by the acts and/or omissions of the State. Therefore, the Court will grant the State's motion on Count V of the Amended Complaint.

### C. Additional Claim for "Bad Faith"

Plaintiffs separately assert, as Count IV, a claim against the State entitled "bad faith." Yet, Plaintiffs fail to articulate a basis for such a freestanding claim that arises outside or apart from any contractual relationship. The nature and scope of the claim appears entirely duplicative of the claim for breach of the implied covenant of good faith and fair dealing. Tellingly, upon review of the section of Plaintiffs' opposition brief addressing "bad faith," the Court finds no authorities discussing, much less supporting, an extra-contractual claim for "bad faith." *See* Pls.' Opp'n at 10-13. The only case cited there is *Tanzer v. MyWebGrocer, Inc., supra*, a case addressing the implied covenant of good faith and fair dealing. Our Supreme Court has observed that the term, "bad faith," is often employed as "the general shorthand for breach of the implied covenant of good faith and fair dealing." *Murphy v. Patriot Ins. Co.*, 2014 VT 96, ¶ 17, 197 Vt. 438. That appears to be the case here. Accordingly, for the reasons stated above as to the claim for breach of the implied covenant, and because the Court does not find that there is an independent claim for "bad faith," the Court will grant summary judgment to the State on Count IV.

## II. The Railroad's Motion On the Claim for Tortious Interference With Contract

In Count VI, Plaintiffs allege that the Railroad is liable for tortious interference with contract, by inducing or otherwise causing the State to fail to perform contractual duties owed to Plaintiffs. Our Supreme Court adheres to the *Restatement* standard for such a claim, which is as follows:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other from the failure of the third person to perform the contract.

*Restatement (Second) of Torts* § 766; *see also Kneebinding, Inc. v. Howell*, 2018 VT 101, ¶ 93, 208 Vt. 578 (explaining that under this *Restatement* section, the plaintiff must prove actual harm as a result of defendant's interference).

Plaintiffs' theory is that the Railroad, by initially closing the crossing unilaterally, and then successfully petitioning the Board for a permanent order of closure, prevented the State from performing its executory obligations under the contract (*i.e.,* continued maintenance at the crossing). However, assuming *arguendo* that this theory is viable and supported by sufficient evidence, Plaintiffs have not shown harm or injury to their interests from the State's failure to perform its maintenance obligations after the crossing was closed. Additional maintenance work

at the crossing, *after* its closure, would not have benefitted Plaintiffs in any respect.[8]  Indeed, Plaintiffs identify no pecuniary loss, stemming from any post-closure failure to maintain the crossing.  They also fail to point to evidence demonstrating that they have suffered other, consequential harms, injuries, or losses, proximately resulting from the State's failure to perform (or the impossibility of performing) maintenance at the crossing *after* its closure.

Furthermore, there is insufficient evidence from which a jury could find that the Railroad's actions were "improper," within the meaning of the *Restatement.  See Restatement (Second) of Torts* § 767 (listing factors relevant to the "improper interference" element, including the nature of the actor's conduct, the actor's motive, interests with which the actor's conduct interferes, and interests sought to be advanced by the actor); *Gifford v. Sun Data, Inc.*, 165 Vt. 611, 612 (1996) (mem.) (citing § 767).  Most significantly, as discussed above, there is no evidence demonstrating that the Railroad acted for any reason or motive other than to advance a significant public safety interest—preventing a collision at the crossing.  Relatedly, to the extent the Railroad's actions are understood to have caused the temporary and permanent closure of the crossing, then the Railroad is thereby responsible for *securing* that significant public safety interest.  Far from "improper," the Railroad's actions thus furthered the public welfare.

Section 767(e) of the *Restatement* lists, as relevant to the issue of improper interference, "the social interests in protecting the freedom of action of the actor and the contractual interests of the other."  There is certainly a strong interest in the enforcement and enjoyment of valid private contracts, such as easements by deed that run with the land, and related contractual duties to maintain such easements.  However, Plaintiffs' claim also clearly and adversely impacts society's interest in protecting the Railroad's freedoms, in particular, its speech and petition rights under the First Amendment and the Vermont Constitution.  After all, the Railroad's actions here included petitioning the State government (the Board) for relief—the order of permanent closure.  Thus, to find the Railroad's actions "improper" here, and thereby force it to pay compensatory damages on a claim for tortious interference, would significantly impair and chill the Railroad's First Amendment rights and those afforded under the Vermont Constitution. *See Jacobsen v. Garzo*, 149 Vt. 205, 208 (1988)  ("Free and uninhibited access to the courts is an important right of all citizens.  Indeed, in Vermont this right is recognized by our fundamental law." (citing Vt. Const. ch. I, art. 4)); *Kollar v. Martin*, 167 Vt. 592, 593-94 (1997) ("'as a matter of law, the filing of a lawsuit alone cannot constitute tortious interference with contractual relations'" (quoting *Jacobsen*, 149 Vt. at 209)); *Regel v. Campbell Soup Co.*, No. 24-CV-6541 (KMK), 2025 WL 2733840, at *6 n.3 (S.D.N.Y. Sept. 25, 2025) (claims for tortious interference predicated on litigation brought by defendant are "routinely" barred by courts under the First Amendment doctrine known as *Noerr- Pennington*).  This is another factor that weighs against the Railroad's liability for tortious interference.

---

[8] The Board also found that no amount of maintenance work by the State would be adequate to warrant the opening of the crossing.  Thus, assuming the Railroad's actions interfered with the State's ability to perform maintenance work, that interference resulted in an inconsequential loss to Plaintiffs, since the lack of maintenance was not the actual cause of the closure of the crossing, or the resulting deprivation of Plaintiffs' right to use of the crossing.

In conclusion, Plaintiffs' claim fails for lack of evidence of damages and on the element that the Railroad's actions were "improper."

## **ORDER**

Wherefore, the Court GRANTS the motion for summary judgment by Defendant State of Vermont as to all remaining claims pled against the State (Counts II-V of Plaintiffs' Amended Complaint). The Court GRANTS the motion for summary judgment by Defendant Washington County Railroad Company on Count VI of Plaintiffs' Amended Complaint, the lone claim remaining against the Railroad.

Motion #32 is GRANTED in favor of Defendant the State of Vermont to all counts (II, III, IV, V).

Motion #33 is GRANTED in favor of the Defendant Washington County Railroad Company to the remaining count VI.

The Court will separately enter a final judgment in favor of Defendants.

Dated December 29, 2025.

Electronically signed pursuant to V.R.E.F. 9(d).

*Kerry A. McDonald-Cady*

_____

Kerry A. McDonald-Cady, Superior Court Judge